UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------- x
                                          :
CAROLYN M. MACK                    :          3:09 CV 2122 (JBA)
                                            :
V.                                         :
                                            :
MICHAEL J. ASTRUE                    :          DATE: FEBRUARY 18,  2011
COMMISSIONER, SOCIAL SECURITY        :
ADMINISTRATION                   :
-------------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND
FOR A REHEARING, AND ON DEFENDANT'S MOTION FOR ORDER AFFIRMING THE
DECISION OF THE COMMISSIONER

       This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g)

and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of

Social Security denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

       On June 1, 2006, plaintiff Carolyn M. Mack filed her application for DIB alleging

an inability to perform substantial gainful activity since April 1, 2006 because of a heart

condition, a heart attack and arthritis. (Certified Transcript of Administrative Proceedings,

dated January 14, 2010 ["Tr."] 82-91). The Social Security Administration ["SSA"] denied

plaintiff's claim both initially and upon reconsideration.  (Tr. 61-65, 67, 69-71).   On

September 17, 2007, plaintiff requested a hearing before an Administrative Law Judge

["ALJ"], and on August 14, 2008, a hearing was held before ALJ  Eileen Burlison, at which

a vocational expert testified.  (Tr. 30-60, 73; see Tr. 75-79).  Plaintiff was represented by

counsel at the hearing.  (Tr. 30, 66, 68, 72, 80-81).  On August 28, 2008, ALJ Burlison

issued her decision denying plaintiff's claim.  (Tr.10-19).  On September 12, 2008,

plaintiff requested review of the  ALJ's decision by the Appeals Council. (Tr. 8-9; see also

Tr. 20-28, 74).  On November 12, 2009, the Appeals Council denied plaintiff's request for review, rendering ALJ Burlison's decision the final decision of the Commissioner.  (Tr. 1-5).

Plaintiff filed her Complaint on December 29, 2009 (Dkt. #1), in response to which defendant filed his Answer on March 8, 2010. (Dkt. #7).[1]  Thereafter, on March 25, 2010, plaintiff filed her Motion for Judgment on the Pleadings and brief in support. (Dkt. #8).[2]  On May 17, 2010, defendant filed his Motion for Order Affirming the Decision of the Commissioner and brief in support.  (Dkt. #11; see Dkts. ##9-10).  On January 5, 2010, United States District Judge Janet Bond Arterton referred this case to this Magistrate Judge.  (Dkt. #3).

For the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #8) is **denied**, and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #11) is **granted**.

## II. FACTUAL BACKGROUND

### A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING

Plaintiff is now sixty-nine years old (Tr. 35, 82), with one daughter and two grandchildren.  (Tr. 43; see Tr. 109, 131).  Plaintiff completed high school with no special training other than what she received on the job.  (Tr. 36-37, 115, 303).

According to plaintiff, her disability is the result of a heart condition, heart attack,

---

[1]Attached to defendant's Answer is a certified copy of the transcript of the record, dated January 14, 2010. (Dkt. #7).  A substantial number of medical records are duplicates.

[2]Plaintiff's date last insured to qualify for disability benefits under 42 U.S.C. 423(c) is March 31, 2008.  (See Dkt. #8, Brief at 1, n.1; see also Tr. 13).  Plaintiff began receiving Social Security Retirement benefits on her 65th birthday (see Tr. 36), which was August 2, 2007.  Therefore, the relevant period of disability at issue for the purpose of plaintiff's claim is the period from April 1, 2006 to August 1, 2007.  (Dkt. #8, Brief at 1, n.1).

and arthritis. (Tr. 41, 63, 69, 110, 149, 256). Plaintiff claims that her heart condition worsens when she tries to work because she only has twenty percent usage of her heart. (Tr. 110).[3] She further claims that the surgical placement of the defibrillator left her "stressed out and tired." (Tr. 43). Plaintiff states that she has arthritis on the right side of her body, specifically from her knee to her hip and around the right side of her back, such that she walks with a limp. (Tr. 48, 51-52, 149; see Tr. 158).

Plaintiff lives in a single floor house, alone with her dog. (Tr. 44-45, 124, 142, 145). She is a former smoker, who smoked a half a pack a day for forty years, but quit in 2001. (Tr. 49, 198, 294, 345, 350, 375, 421, 508, 510, 586; see Tr. 184, 201, 265, 433).[4] On April 16, 2006, plaintiff claimed that she had "a serious drinking problem" when she owned a bar; nonetheless, she stated that she had not had an alcohol abuse problem "for the last [twenty] years." (Tr. 198, 345, 421-22; see Tr. 586). However, on May 31, 2007, plaintiff called Shannon Simmons of the Connecticut Disability Determination Services ["DDS"] to deny allegations of such alcohol abuse after receipt of a letter alleging same. (Tr. 159). Furthermore, on August 14, 2008, plaintiff testified before the ALJ that she occasionally consumed alcohol, but never had an alcohol problem. (Tr. 49; see also Tr. 159).

According to plaintiff, her normal day begins with taking her medication, which is

---

[3]Plaintiff's medical records consistently show an ejection fraction of twenty percent, or less than twenty percent. (Tr. 149, 180, 182, 191, 198, 419, 429; but see Tr. 235 (plaintiff's medical history includes an ejection fraction of ten percent even though plaintiff's pre-and post-operative diagnosis on the same page states that her ejection fraction is twenty percent), Tr. 317 (plaintiff claimed that she had an ejection fraction of thirty percent)).

[4]According to a letter from Middlesex Hospital, dated April 16, 2006 and Dr. Marieb's letter approving plaintiff's fitness for hip replacement surgery, plaintiff quit smoking in 2003. (Tr. 198, 421).

then followed by a nap because the pills cause her to be "very drowsy and tired." (See Tr. 44, 317).  After she wakes up around 11:00 a.m., she "do[es] things in the house," including making the bed and making herself food.  (Tr. 44, 125, 143, 303; see Tr. 317). Plaintiff consistently has claimed that she is able to care for her personal hygiene and cooks her daily meals. (Tr. 125-26, 143-44, 303, 317; see Tr. 248).  Plaintiff claims that she spends between one half hour to two hours to prepare all her meals. (Tr. 126, 144). She also noted on July 8, 2006 that since the implantation of the defibrillator, her appetite had improved (Tr. 126); however, as of March 31, 2007, plaintiff claimed that she sometimes had no appetite. (Tr. 144).[5]

On March 31, 2007, plaintiff claimed that she only slept in two hour intervals because of the pain in her right hip. (Tr. 143).  In her testimony before the ALJ, plaintiff affirmed her difficulty sleeping, explaining that she must sleep with a pillow between her legs in order to elevate her right leg and alleviate some of her pain.  (Tr. 52-53).

As of July 8, 2006, plaintiff stated she was able to clean the house daily, do the laundry, and iron without assistance; however, she noted that since the onset of her physical condition these tasks took her longer because she fatigued easily. (Tr. 127; see Tr. 155, 169).  By March 31, 2007, plaintiff reported that her daily activities were limited to taking her medication, making her bed, eating, reading, watching television, and going to doctor's appointments. (Tr. 143).  While plaintiff still claimed that as of March 31, 2007, she was able to perform housework, she alleged that it took her about two hours to clean the bedroom, wash dishes, and clean the kitchen, as she had to stop to rest

_____

[5]As of February 12, 2009, Dr. Stephen Rossner, of Cardiology Associates of Central Connecticut, noted that plaintiff gained some weight and she told him that it was because she had been eating more. (Tr. 523, 572, 579).

4

while cleaning. (Tr. 145).  Furthermore, on that date, plaintiff stated that she could no longer perform yard work (i.e., planting flowers, weeding grass, etc.)  because her yard is too large.  (Id.).  However, when plaintiff testified before the ALJ on August 14, 2008, she stated that she was able to dust and do minor household cleaning, but her daughter had to help her with heavy cleaning.  (Tr. 46).

As of July 8, 2006, plaintiff reported she was able to make sure her dog has food and water and she would walk her dog in the yard. (Tr. 124-25). However, as of March 31, 2007, plaintiff alleged that her daughter must walk her dog and buy the dog food. (Tr. 142).

On July 8, 2006, plaintiff claimed that she was able to go outside alone and did so daily by walking or using her car. (Tr. 127).  However, by March 31, 2007, plaintiff contended that while she was able to go outside alone, and she only went outside by driving or riding in a car to go to doctor's appointments. (Tr. 145).  Additionally, in her testimony before the ALJ on August 14, 2008, plaintiff stated that she can only walk for a half a block before having to stop and rest for five to ten minutes because she is out of breath and has chest pains. (Tr. 53; see Tr. 148).

As of July 8, 2006, plaintiff alleged that she had a driver's license and occasionally drove. (Tr. 127; see also Tr. 317).  However, plaintiff testified before the ALJ on August 14, 2008 that while she still had a driver's license, she could not drive anymore because of the arthritis in her right leg. (Tr. 44; see Tr. 143; see also Tr. 523, 572, 579). Furthermore, on July 8, 2006, plaintiff stated that since the onset of her physical impairment, she shopped less frequently -- about once every two weeks for about thirty minutes without assistance. (Tr. 128).   However, as of March 31, 2007 and in her

testimony before the ALJ on August 14, 2008, plaintiff claimed that she no longer did any shopping; her daughter needed to take her shopping for food. (Tr. 146, 46).

Plaintiff's hobbies include reading, watching TV, sewing, singing in the church choir, and playing the piano and the organ in church. (Tr. 45-46, 50, 129; see Tr. 143, 147, 248).  On March 31, 2007, plaintiff noted that she could not sing or travel with the choir because of her physical condition. (Tr. 147-48).  However, she testified on August 14, 2008 that she still sings in the choir and practices once a week. (Tr. 45).  She further testified that she now only plays the piano for her own enjoyment. (Tr. 50).

As of July 8, 2006, plaintiff detailed her social activities to include talking on the phone daily and going to church almost every Sunday. (Tr. 129).  By March 31, 2007, plaintiff stated that she still talked on the phone daily, but only attended church when her daughter was not working. (Tr. 147).  Plaintiff testified before the ALJ on August 14, 2008, that since her retirement, she has not traveled and no longer has a social life because she has trouble "get[ting] around" in a car, so that most of her social contacts are through the telephone. (Tr. 50).

Plaintiff noted on July 8, 2006 that she "sometime[s]" had problems with her left leg and knee due to arthritis, which affected her ability to climb stairs and kneel. (Tr. 130)(emphasis omitted).  Plaintiff claimed she was prescribed a cane for this problem and had to stop to rest for fifteen to twenty minutes after walking a half mile. (Id.).  However, a year later, plaintiff reported that her ability to sit, stand, climb stairs, kneel, and lift was affected by bad arthritis in her right hip, such that she needed a cane to walk. (Tr. 148).  On August 14, 2008, plaintiff testified that she cannot stand for more than five minutes, sit for over a half-hour, nor carry more than five pounds because of the pain in her right

hip. (Tr. 48-49, 54). Consequently, plaintiff described how she must sit down and elevate her leg for an hour due to the pain after standing. (Tr. 51-52).

B. PLAINTIFF'S WORK HISTORY AND VOCATIONAL ANALYSIS

Plaintiff was employed at Bob's Stores for about twenty years, from November 1985 until October 5, 2005, as a sales auditor performing accounting functions, reviewing the sales activities for the previous days, and coordinating store markdowns, for their thirty-two to thirty-four stores. (Tr. 36-38, 98-102, 111, 447). The position involved the use of technical skills and knowledge, as well as writing and completing reports. (Tr. 37-38, 111, 176). Plaintiff evolved with her job into the computer age through computer classes and on-the-job training. (Tr. 39). Plaintiff claims that she sat, wrote, typed, and handled small objects for eight hours a day. (Tr. 111). She notes that she had her own office and was sedentary most of the time, but still had occasion to move around, such as to carry boxes of paper, weighing less than ten pounds. (Tr. 54-55, 111).

Plaintiff has been retired since October 5, 2005. (Tr. 36, 40, 110; see Tr. 447). However, plaintiff claims that she took the retirement package because she was "downsized," and otherwise she would have continued working at Bob's Stores. (Tr. 39-40, 110, 317).[6] Initially, plaintiff collected unemployment until she became eligible to collect Social Security in 2006. (Tr. 40-41, 107-08).

Sheila Chunis of Connecticut DDS conducted her vocational analysis of plaintiff on December 13, 2006, which was subsequently affirmed six months later, on June 13, 2007. (Tr. 132, 160). In her analysis, although Chunis found that plaintiff had "a severe physical impairment," she concluded that the impairment "d]id] not meet or equal any

---

[6]The retirement package included severance pay, but not health insurance. (Tr. 40). Plaintiff paid for her own health insurance. (Id.).

listing level," so that plaintiff was not considered disabled. (Tr. 132). Chunis determined that plaintiff was capable of lifting ten pounds frequently and twenty pounds occasionally, and could walk, stand, or sit for six of the eight hours in a workday. (Id.). Furthermore, Chunis concluded that plaintiff "ha[d] all postural limitations occasionally except frequent balancing and kneeling" and had "no environmental limitations." (Id.).

Renee B. Jubrey, the vocational expert who appeared before the ALJ on August 14, 2008, testified that plaintiff's job was considered a sedentary skilled job with transferable skills. (Tr. 56; see Tr. 176). However, Jubrey indicated that contrary to the DOT's classification of the position as sedentary, plaintiff's position was considered light because she had to lift and carry boxes of paper daily. (Tr. 57-58; see also Tr. 54-56, 246). Jubrey also testified that a hypothetical person in the national economy with plaintiff's "light" exertional limitations and occasional postural limitations would be able to get alternative employment in semi-skilled work, such as a "control clerk audit[or],"[7] a photo lab employee who works with computer-controlled photo printing,[8] or an appointment clerk.[9] (Tr. 56-58). When the hypothetical was altered to include the person being absent from work for more than three times a month, Jubrey testified that there are no jobs that would tolerate that level of absenteeism. (Tr. 59).

C. MEDICAL HISTORY PRIOR TO PLAINTIFF'S ONSET DATE OF DISABILITY

In 1998, plaintiff was diagnosed with breast cancer in her right breast and

---

[7]According to Jubrey, there were 180 positions regionally and 32,000 positions nationally for this position. (Tr. 57).

[8]Jubrey testified that at this time there were 320 regional positions and 76,000 national positions as a photo lab worker. (Tr. 57).

[9]Jubrey testified that there were 450 appointment clerk positions regionally and 275,000 positions nationally. (Tr. 57).

underwent a lumpectomy and radiation, followed by five years on Tamoxifen.  (See Tr. 196, 198, 221, 419, 527, 530, 585; but see Tr. 317, 421 (indicating that lumpectomy and radiation occurred in 1999 and in 2000, respectively)).  Additionally, prior to plaintiff's onset date, she had injections in her right hip at Midstate Hospital, as well as injections in her shoulder to alleviate arthritis pain.  (Tr. 51, 149, 337, 506, 570; see also Tr. 317).[10] Plaintiff also claims that she has a history of thyroid disease, but there is no evidence of prescription treatment in her records. (Tr. 585).

Plaintiff had a heart attack in 2001. (Tr. 41, 110, 317).[11]  She was under the medical care of Dr. Pamela Randolph and cardiologist Dr. Stephen Rossner of Internal Medicine Associates, P.C. and Cardiology Associates of Central Connecticut, LLC, respectively. (Tr. 42, 112, 152, 165-66, 204, 411; see Tr. 120-21, 445).[12]  In 2001, Dr. Rossner diagnosed plaintiff with nonischemic cardiomyopathy and attributed it to ethanol alcohol use. (Tr. 392, 454; see also Tr. 214, 261, 294-95, 303, 345-46, 359, 366, 373, 391-92, 394, 398, 400-01, 404-05, 408, 419, 421, 423, 431, 449-51, 454, 458, 484, 523,

---

[10]Plaintiff claims that she had two injections into her right hip at Midstate Hospital in 1998 and 2001. (Tr. 149).  However, Dr. Micha Abeles of Connecticut DDS detailed hip injections in 1997, 1998, and 1999 upon reviewing plaintiff's medical history. (Tr. 317; see also Tr. 337, 506, 570).  Plaintiff believed these shots helped the pain to subside for approximately three years, but then the pain returned. (Tr. 51).  Plaintiff stated that she received an injection for the pain in her arm in 2005, but as of August 14, 2008 she "fe[lt] it coming back again." (See Tr. 51).

[11]According to plaintiff's "Disability Report," Form SSA-3368, her heart problems began in July 2002. (Tr. 110).

[12]Plaintiff visited Dr. Randolph on February 28, 2003 for her heart condition, breast cancer, and arthritis. (Tr. 219-22).  Dr. Randolph examined plaintiff on October 1, 2003 for asthma, loss of appetite, and a flu shot. (Tr. 217-18).  Plaintiff was examined by Dr. Randolph on March 10, 2004 for a check-up, as well as for medical advice related to symptoms from seasonal allergies. (Tr. 215-16). Dr. Rossner examined plaintiff March 4, 2005 for a general heart check-up, at which time plaintiff reported that she was "feeling good." (Tr. 214, 359, 405).  Plaintiff was treated by Dr. Randolph three days later for bruised right ribs as a result of falling. (Tr. 212-13, 357-58).  Plaintiff was taken off of Accupril on April 11, 2005. (Tr. 359, 405; see also Tr. 404).

572, 579, 584-87). The nonischemic dilated cardiomyopathy developed into congestive heart failure. (Tr. 198, 419, 421, 584-86).[13] Since July 2001, Dr. Rossner has prescribed 20 mg Furosemide,[14] 0.125 mg Digoxin,[15] 10 mg Lisinopril,[16] 81 mg Aspirin, and 100 mg B-1 daily. (Tr. 446). On July 9, 2001, plaintiff had a cardiac catheterization at St. Francis Hospital that showed plaintiff's ejection function to be twenty percent. (Tr. 180, 193-96, 198, 419, 421, 431-32, 584; see also Tr. 248).[17] Plaintiff's "history of heavy alcohol abuse and . . . a viral syndrome" were also noted at this time and it was opined that her cardiomyopathy could have been induced by alcohol or the viral syndrome. (Tr. 584; see also Tr. 194, 432). Plaintiff subsequently underwent a hemodynamic examination by the Arrhythmia Research Group on July 20, 2005. (Tr. 407). On August 18, 2005, plaintiff saw Dr. Rossner, who noted that plaintiff's ejection fraction was "approaching normal" and that plaintiff's liver function tests came back abnormal. (Tr. 404, see Tr. 225-26). Dr.

_____

[13]Plaintiff was hospitalized for congestive heart failure in 2003. (Tr. 180, 196, 198, 419, 421).

[14] Furosemide is a diuretic that is prescribed to people with congestive heart failure to treat high blood pressure by preventing fluid retention. (Furosemide Information from Drugs.com, http://www.drugs.com/furosemide.html (last visited July 7, 2010)). Plaintiff also claimed that Furosemide causes her drowsiness. (Tr. 154, 168; see Tr. 53, 317).

[15]Digoxin is prescribed to patients with congestive heart failure to make their "heart beat stronger and with a more regular rhythm." (Digoxin Information from Drugs.com, http://www.drugs.com/digoxin.html (last visited July 7, 2010)). Plaintiff noted that Digoxin causes her drowsiness. (Tr. 154, 168; see Tr. 53, 317).

[16]Lisinopril is an angiotensin-converting enzyme inhibitor, which lowers blood pressure by relaxing the blood vessels and is prescribed to people after heart attacks to increase survival. (Lisinopril Tablets Facts and Comparisons at Drugs.com, http://www.drugs.com/cdi/lisinopril.html (last visited July 6, 2010)). Plaintiff stated that Lisinopril makes her drowsy. (Tr. 154, 168; see Tr. 53, 317).

[17]Dr. William M. Allen of Middlesex Hospital's dictation dated April 16, 2006 described plaintiff's cardiac catheterization being performed "about three years ago at St. Francis." (Tr. 193, 431). It is not clear whether Dr. Allen is referring to the same cardiac catheterization of July 2001 with an incorrect year or if plaintiff had an additional cardiac catheterization around 2003.

Rossner examined plaintiff on December 22, 2005 and noted that "her cardiomyopathy [was] very minimal at this point" and that plaintiff "denie[d] any shortness of breath or chest pain." (Tr. 403).

### D. MEDICAL RECORDS FROM ONSET DATE TO PRESENT

Plaintiff alleges that the onset of her disability was April 1, 2006. (Tr. 110, 117, 248-49, 256, 303, 410).[18]   Plaintiff alleges her disability is the result of congestive heart failure, right hip osteoarthritis, right shoulder impairment, and lumbar radiculopathy. (Tr. 317, 585).

On April 16, 2006,[19] plaintiff passed out in church and was admitted to Middlesex Hospital for three days where she was treated by Dr. Joshua San Vicente. (Tr. 179-84, 186-203, 418-35).[20]   She was hospitalized with chest pain, a possible heart attack, and being excessively hot to the point of collapsing.  (Tr. 179, 195, 418).  Upon admission, she was taking 81 mg of Aspirin, 0.125 of Digoxin, 20 mg of Lasix, and 25 mg of Toprol-XL daily. (Tr. 180, 196, 419).[21]   Hospital doctors diagnosed plaintiff with "[s]evere cardiomyopathy with near syncope," diaphoresis, hypokalemia, and possible alcohol withdrawal. (Tr. 194, 198, 419, 421).  Dr. Rossner described this episode as congestive heart failure, which featured a "reversion of her heart muscle function to a severe

[18]The last date that plaintiff was insured was March 31, 2008. (Tr. 117, 134, 161, 449).

[19]Plaintiff's Disability Report, Form SSA-3441, describes plaintiff being admitted to Middlesex Hospital on April 7, 2006 and being released April 8, 2006 for cardiovascular disorders, high blood pressure, and high cholesterol, where she received tests, exams, medication, and blood work from the doctors on staff. (Tr. 167).

[20]The record mistakenly includes the medical records from Middlesex Hospital for a different patient with a similar name. (Tr. 531-41).

[21]Toprol-XL is a beta-blocker that is prescribed "to treat or prevent [a] heart attack," angina, and hypertension. (Toprol-XL (metoprolol) medical facts from Drugs.com, http://www.drugs.com/mtm/toprol-xl.html (last visited July 6, 2010)).

dysfunction" that was not attributable to heart disease. (Tr. 392, 454).

Although St. Francis Hospital noted that they suspected plaintiff's cardiomyopathy was secondary to alcohol abuse, plaintiff denied regular heavy alcohol abuse during the hospitalization. (Tr. 180-81, 194, 196-200, 419-21, 432; <u>see</u> Tr. 584). Plaintiff's admission to drinking wine once a week is noted in the Emergency Department Record of April 16, 2006; however in plaintiff's History and Physical of the same day, it was noted that plaintiff drank a couple of glasses of wine a week. (Tr. 193, 198-99). Plaintiff claimed her last drink was on April 14, 2006; at first she acknowledged drinking two glasses of wine that day, which she later revised to "three or so" glasses. (Tr. 198-99). However, during this hospitalization, doctors noted that plaintiff went through mild withdrawal, as evidenced by withdrawal tremors, such that plaintiff was given Ativan. (Tr. 181, 194, 197, 199-200, 420, 423, 432).

While hospitalized, she received a chest x-ray of her heart, an EKG, a stress test, a cardiac catherterization/angiogram/echocardiogram (Tr. 201, 268-69, 274-75, 429-30, 434-35), blood tests (Tr. 283-87, 424-28), and a MRI/CT chest scan (Tr. 265, 433. <u>See also</u> Tr. 179-80, 195-96, 418-19). Plaintiff's echocardiogram on April 17, 2006 showed no arrhythmia, mild to moderate dilation in the left ventricle, severe depression in left ventricle function, severe left ventricle systolic dysfunction, thickening of the aortic valve, mild to moderate mitral and aortic insufficiency, severe global hypokinesis evidenced by an ejection function of less than twenty percent, mild pulmonic insufficiency, and sinus rhythm with a left bundle branch block pattern. (Tr. 179-80, 182-83, 191-92, 195-96, 274-75, 418-19, 422, 429-30; <u>see</u> Tr. 199, 202-03). The Doppler study of the echocardiogram showed mild to moderate mitral regurgitation, aortic regurgitation, and

mild pulmonic regurgitation. (Tr. 274, 429). Plaintiff's chest x-ray did not show any acute infiltrates. (Tr. 184, 199, 201, 265, 422, 433). Plaintiff was discharged from Middletown Hospital on April 18, 2006 with prescriptions for 81 mg Aspirin, 0.125 mg Digoxin, 20 mg Lasix, 25 mg Toprol, and 1 multivitamin daily. (Tr. 181, 197, 420).

Following her discharge from Middlesex Hospital, plaintiff was seen by Dr. Randolph for a follow-up exam on April 25, 2006. (Tr. 210-11, 385-86, 518-19; see also Tr. 279-82, 387-90). Plaintiff told Dr. Randolph that she felt good and that she was scheduled to see Dr. Rossner later in the day. (Tr. 210-11, 385-86, 518-19).

Plaintiff was seen by Dr. Rossner the same day for further examination of her heart condition as a follow-up to her hospitalization. (Tr. 264, 402). He opined that plaintiff's poor left ventricular function and resulting syncopal episode developed over the past year because plaintiff's echocardiogram of May 2005 only showed a mild abnormality. (Id.). Dr. Rossner noted that plaintiff said she felt fine, but she became lightheaded when she was in a situation where it was crowded and warm. (Id.). Dr. Rossner continued plaintiff on her present medications and additionally prescribed 1-1/2 6.25 mg pills of Coreg daily. (Tr. 446).[22] Additionally, Dr. Rossner ordered a Adenosine Cardiolite stress test and a twenty-four-hour Holter monitor to be conducted on May 5, 2006 (Tr. 264, 270-73, 366-68, 402, 408-09). The stress test yielded "[n]ormal [a]denosine infusion with baseline LBBB." (Tr. 366, 408). A SPECT Myocardial Perfusion Image following exercise and at rest was also conducted on May 5, 2006. (Tr. 115, 271-

---

[22]Coreg is a beta-blocker that is prescribed for heart failure, high blood pressure, and to treat or prevent heart attacks because it affects the "blood flow through arteries and veins." (Coreg Information from Drugs.com, http://www.drugs.com/coreg.html (last visited July 7, 2010)). Plaintiff noted that Coreg has the side-effect of making her "very sleepy and drowsy." (Tr. 114, 154, 168; see Tr. 53, 317).

72, 367, 409; <u>see</u> Tr. 120, 368). This imagining yielded an abnormal image of "a dilated left ventricle without scintigraphic evidence of ischemia or scar," as well as "[p]aradoxical septal motion with global left ventricular hypokinesis and moderately reduced global LV function." (Tr. 367, 409; <u>see</u> Tr. 368; <u>see also</u> Tr. 173, 270-72). Plaintiff was asymptomatic during the duration of the twenty-four-hour Holter Monitor examination and only sixteen isolated PVCs were noted. (Tr. 273, 399).

Plaintiff was seen by Dr. Rossner on May 18, 2006 to review the results of the Adenosine Cardiolite test. (Tr. 263, 401). Dr. Rossner noted that plaintiff was a candidate for a defibrillator and he referred her to Dr. Magdy Migeed of Hartford Hospital. (<u>Id.</u>).[23] Plaintiff was seen by Dr. Randolph of Internal Medicine Associates, PC for blood work and an electrocardiogram on June 1, 2006. (<u>See</u> Tr. 267).[24]

On June 2, 2006, plaintiff's need for surgical implantation of a defibrillator was evaluated by Dr. Migeed. (<u>See</u> Tr. 294-95, 345-46). During the examination, Dr. Migeed observed the plaintiff "sitting comfortably." (Tr. 295, 346). Dr. Migeed concluded that plaintiff was at a high risk for sudden cardiac death because of the "left ventricular dysfunction, cardiomyopathy, left bundle branch block, and heart failure," so that she should have surgery for placement of a dual-chamber cardiac defibrillator. (Tr. 235, 294-95, 345-46; <u>see</u> Tr. 237, 256). Around the time of Dr. Migeed's recommendation and before her defibrillator surgery, plaintiff claimed Dr. Rossner advised her that she should not work anymore. (Tr. 47).

_____

[23]Form SSA-3368 states that plaintiff saw "Dr. Mcgee" at Hartford Hospital (Tr. 113).

[24]The print-out of the electrocardiogram (Tr. 267) and notations prior to plaintiff's defibrillator surgery (Tr. 471) describe the blood work and electrocardiogram as being conducted on June 1, 2006; however Dr. Migeed described the electrocardiogram as being conducted on June 2, 2006 in a letter dated the same date to Dr. Rossner. (Tr. 295, 346).

Three days later, Dr. Migeed implanted a dual chamber cardioverter-defibrillator over plaintiff's heart to control its beat. (Tr. 235-38, 470-73, 482-85).[25]  After the device was implanted, intra operative testing of the device was conducted. (Tr. 236).  Plaintiff experienced intermittent chest pain and shortness of breath, so that she was given Toradol to help with the chest pain. (Tr. 237).[26]  During plaintiff's post-operative recovery, the hospital performed an EKG, stress test, cardiac cathererization/angiogram/echocardiograms, chest x-ray, blood work related to her cardiovascular disorders.  (Tr. 240-44, 486-89).  Specifically, her post-operative echocardiogram showed a small effusion, so that Dr. Migeed ordered additional echocardiograms on June 6, 2006 and June 7, 2006, which showed a small to moderate "anteriorly located pericardial effusion." (Tr. 237, 239, 469; see also Tr. 240-41, 243-44, 486-89).  Plaintiff was discharged from Hartford Hospital on June 7, 2006.[27] (Tr. 237-38).  She was directed to resume her prior prescription regiment, in addition to taking 500 mg of Keflex for five days. (Tr. 237).  Plaintiff's defibrillator was monitored every three months by phone and every six months by a physical examination by Dr. Jeffrey Kluger of the Henry Low Heart Center of Hartford Hospital. (See. Tr. 46, 523, 572, 579).[28]

---

[25]Form SSA-3368 (Tr. 113) and Chunis' request for reports related to the surgery (Tr. 234) note plaintiff's defibrillator surgery was on June 1, 2006.  However, Hartford Hospital's Operative Report (Tr. 235-36) and Discharge Summary (Tr. 237-38) state that the procedure was on June 5, 2006.

[26]Toradol is an anti-inflammatory drug that is usually prescribed for short periods of time "to treat moderate to severe pain, usually after surgery." (Toradol (ketorolac) Information from Drugs.com, http://www.drugs.com/toradol.html (last visited July 12, 2010)).

[27]Form SSA-3368 (Tr. 113) and Chunis' request for reports related to the surgery (Tr. 234) note plaintiff's discharge was on June 2, 2006.  However, Hartford Hospital's Operative Report (Tr. 235-36) and Discharge Summary (Tr. 237-38) state that plaintiff was released on June 7, 2006.

[28]David McCornas, R.N. and Dr. Kluger examined plaintiff's defibrillator on July 19, 2006, at which time she was stable with respect to her arrhythmia, such that her defibrillator's voltage was

As of July 8, 2006, plaintiff was taking 6.25 mg of Coreg twice daily, 20 mg of Furosemide, 0.125 mg of Digoxin daily, 10 mg of Lisinopril, 100 mg B1, and 81 mg of Aspirin daily. (Tr. 126; <u>see</u> Tr. 177). On August 26, 2006, Chunis requested medical advice regarding plaintiff's initial case history and filed similar requests on October 5, 2006 and December 7, 2006. (Tr. 245-46, 410). In her October 5, 2006 request, Chunis noted plaintiff's history of sedentary work and her doubts that "less than sedentary can be done." (Tr. 246).

---

decreased. (Tr. 292-93, 324, 344). Additionally, Dr. Kluger enrolled plaintiff in an Ad Mag research study and scheduled her follow-up visit for October 4, 2006. (Tr. 292-93, 324, 344; see also Tr. 584).

Danette Guertin, A.P.R.N. and Dr. Kluger saw plaintiff on October 4, 2006 for a follow-up examination of her defibrillator, at which time Dr. Kluger noted three supraventricular tachycardia and "[four] episodes of brief rapid atrial fibrillation resulting in burst ventricular pacing therapy." (Tr. 290, 323, 343; see also Tr. 362, 400, 584). Dr. Kluger recommended that plaintiff's Coreg be increased to 12.5 mg and programmed plaintiff's defibrillator to a mode to better record the duration of her atrial fibrillations. (Tr. 262, 290, 323, 343, 400; see also Tr. 584-85). Dr. Kluger also scheduled a follow-up examination for December 27, 2006. (Tr. 290, 343).

McCornas and Dr. Kluger evaluated plaintiff's defibrillator on January 24, 2007; Dr. Kluger concluded that she was "stable from an arrhythmia standpoint." (Tr. 288-89, 303, 322, 342, 477; see also Tr. 321, 476, 585). Prior to her hip replacement surgery, plaintiff's defibrillator was checked by Thea Ling, R.N. and Dr. Kluger on May 2, 2007, and they noted plaintiff was "do[ing] well from an arrhythmia standpoint," so that no change was made to her medication or device. (Tr. 321, 476). Ling and Dr. Kluger examined plaintiff's defibrillator on August 22, 2007, at which time they again concluded that plaintiff was doing well with respect to arrhythmias. (Tr. 320, 475). On November 21, 2007, one "episode of SVT at 116 bpm" was transmitted when Ling and Dr. Kluger performed a remote examination of plaintiff's defibrillator. (Tr. 319, 474).

In January 2008, plaintiff saw Dr. Kluger for a check-up (Tr. 445), and five months later, Ling and Dr. Kluger remotely inspected plaintiff's defibrillator and found "no tachy arrhythmias greater than 164bpm." (Tr. 481). On August 13, 2008 plaintiff was evaluated by Ling and Dr. Kluger, who stated that the leads and battery were stable and plaintiff similarly "continue[d] to do well from an arrhythmia standpoint." (Tr. 480). Ling and Dr. Kluger remotely evaluated plaintiff's defibrillator again on November 19, 2008 and saw one "episode of VT on Oct 22 successfully terminated with ATP therapy." (Tr. 479).

Plaintiff's defibrillator's programmed settings and lead parameters were evaluated by Ling and Dr. Kluger on February 11, 2009; no tachyarrhythmias were found and the defibrillator had "[n]ormal ICD function." (Tr. 478, 574, 581).

Dr. Rossner examined plaintiff on October 4, 2006; she reported that she presented that morning to Dr. Kluger with high blood pressure. (Tr. 262, 400; see also Tr. 323). Plaintiff did not complain of shortness of breath or chest pain, but did tell Dr. Rossner that she was tired all the time. (Tr. 262, 400). Dr. Rossner increased plaintiff's Coreg to 1-1/2 6.25 mg tablets daily and kept the rest of her medication the same. (Id.). On this same day, plaintiff had an echocardiogram at Hartford Hospital and blood work at Clinical Laboratory Partners LLC. (Tr. 266, 278).

In response to Chunis' request for medical advice on October 6, 2006, Dr. Barbara Coughlin noted for SSA that plaintiff had "dyspnea, dizziness & palpitations," so that Dr. Coughlin "need[ed] a '[consultative examination]'" for a better evaluation of plaintiff's heart condition and arthritis. (Tr. 246-47). Pending a follow-up note from after plaintiff's defibrillator surgery, Dr. Coughlin concluded that she would give plaintiff "a light RFC," but if plaintiff continued to claim a disability, plaintiff's arthritis would need to be evaluated. (Tr. 248).

Plaintiff was seen by Dr. Randolph on October 25, 2006 to request a Pneumovax vaccine, which she received during the examination. (Tr. 362-63, 377-78, 516-17).[29] At the time of the visit, her daily medications included 1-1/2 tablets of 6.25 mg Coreg, 20 mg Lasix, 0.125 mg Digoxin, 10 mg Lisinopril, 81 mg Aspirin, and B1. (Tr. 362, 377, 516). She complained of arthritis in her right knee and hip, which she described as a ten out of ten on a pain scale and claimed that the pain woke her from her sleep. (Tr. 362-63, 377-78, 516-17). Dr. Randolph referred plaintiff to "another orthopedist" and recommended

---

[29]Pneumovax is a vaccine to protect against pneumococcal infections. People with chronic cardiovascular disease have a higher chance of acquiring pneumococcal disease. (Pneumovax 23 Official FDA information, side effects and uses, http://www.drugs.com/pro/pneumovax-23.html (last visited July 12, 2010)).

an ultrasound for plaintiff's goiter. (Tr. 363, 378, 517).

Plaintiff was treated by Dr. John Marino of Connecticut Orthopaedic Specialists, P.C. on November 6, 2006 for right lumbar radiculopathy, osteoarthritis in her right hip, and tendinitis in her right rotator cuff. (Tr. 336-37, 505-06, 569-70).[30] At that time, plaintiff was taking Coreg, Furosemide, Digoxin, Lisinopril, Vitamin B1, and baby aspirin. (Tr. 336, 505, 569). Even though Dr. Marino observed that plaintiff walked without a noticeable limp, she did exhibit leg pain from her hip area to her foot with lumbar flexion and extension, which indicated to Dr. Marino that plaintiff was suffering from right lumbar radiculopathy. (Tr. 326, 336, 443, 494, 505, 569). Dr. Marino also diagnosed plaintiff with osteoarthritis of the right hip because of plaintiff's inguinal/groin pain when she bore weight on her right hip and because plaintiff's x-ray showed "mild arthritis of the glenohumeral joint" of the right shoulder, as well as "significant joint margin osteophytes" and joint space narrowing of the right hip. (Id.). However, Dr. Marino was not sure that plaintiff's right leg pain was from the arthritis in her right hip because the majority of the pain was present when she was lying down, not while she was walking. (Tr. 336-37, 505-06, 559-70). Dr. Marino also postulated that plaintiff's two inter-articular hip injections in the early 1990s may have contributed to the current pain. (Id.).

At the same visit, plaintiff complained of cervical pain and pain in her arm that was exacerbated with activity. (Tr. 336, 505, 569).[31] Dr. Marino diagnosed plaintiff with tendinitis in her right rotator cuff because she exhibited a positive impingement sign and

---

[30]Dr. Marino confirmed his diagnosis in a narrative report dated July 26, 2007. (Tr. 326, 443, 494, 558).

[31]Plaintiff testified before the ALJ on August 14, 2008 that the pain in her right arm caused her arm to cramp, which prevented her from writing and made her drop objects. (Tr. 52).

a positive Hawkin's test. (Tr. 326, 336, 443, 494, 505, 569). During this examination plaintiff received an injection of 1 cc of Dexamethasone[32] in her right shoulder. (Tr. 326, 337, 443, 494, 506, 570). Dr. Marino also prescribed Naprosyn twice a day for plaintiff. (Id.).[33]

At plaintiff's follow-up visit with Dr. Marino on November 2, 2006, Dr. Marino noted that plaintiff was feeling better since the previous shoulder injection and since she started taking Naprosyn. (Tr. 338, 504, 568). He also noted that plaintiff only complained of mild pain in her right leg and thigh and did not note any difficulty sleeping. (Id.). Dr. Marino observed some stiffness in her right hip, but no pain. (Id.). Plaintiff no longer had the shoulder impingement, and could move her arm without sharp pain. (Id.). Plaintiff was directed to return to Dr. Marino as needed. (Id.).

Plaintiff was subsequently examined by Dr. Micha Abeles at the request of the SSA on November 7, 2006. (Tr. 317-18). After examining plaintiff, Dr. Abeles concluded that plaintiff's heart sounds showed a "2-3/6 systolic ejection murmur," and "S4 gallop," and she had a "painful right shoulder on range of motion," limited bilateral hip range of motion with pain, limited abduction and reduced range of motion in her left hip, and that she had a defibrillator implanted. (See Tr. 317-18).[34]

---

[32]Dexamethasone is a corticosteroid that decreases or prevents tissue's response to severe inflammation, such as inflammation brought on by rheumatoid arthritis. (Dexamethasone Tablets Facts and Comparisons at Drugs.com, http://www.drugs.com/cdi/dexamethasone.html (last visited July 12, 2010)).

[33]Naprosyn is a nonsteroidal anti-inflammatory that is prescribed to remedy pain or inflammation from arthritis. (Naprosyn, http://www.drugs.com/naprosyn.html (last visited July 12, 2010)).

[34]On November 15, 2006, Dr. Randolph reviewed plaintiff's blood work, which showed an increase in plaintiff's cholesterol; he recommended plaintiff adopt a lower cholesterol diet. (Tr. 364-65, 383-84, 514-15; see also Tr. 369-70). Additionally, plaintiff received an ultrasound of her thyroid to examine her goiter on the same day, and it revealed a small nodule; a follow-up

Dr. Nathaniel Kaplan, an SSA medical consultant, completed a "Physical Residual Functional Capacity Assessment" of plaintiff on December 8, 2006, in which he concluded that plaintiff could occasionally lift twenty pounds, frequently[35] lift ten pounds, sit, stand and/or walk for six hours of an eight hour workday and had unlimited use of the push and pull ability. (Tr. 249-56). Dr. Kaplan concluded that based on plaintiff's cardiomyopathy and hip pain, she could climb ramps, stairs, ladders, rope, and scaffolds, as well as crouch and crawl occasionally, although he found that plaintiff would be able to balance and kneel frequently. (Tr. 251). Dr. Kaplan noted plaintiff's pain in her right shoulder when her range of motion was tested, as well as a reduced range of motion in her left hip. (Tr. 256). He also noted that plaintiff could still care for her own apartment but she complained of fatigue. (Id.).

Plaintiff was examined by Dr. Rossner on January 4, 2007. (Tr. 261, 373, 398). Dr. Rossner observed that plaintiff was doing well after her defibrillator surgery and was not suffering from shortness of breath, blood pressure issues, or heart palpitations. (Id.). Dr. Rossner continued plaintiff on Digoxin, Lasix, Coreg, and Lisinopril and instructed plaintiff to return in three to four months. (Id.).

On January 22, 2007, plaintiff was seen by Dr. Marino, complaining of increased pain in her lower back that extended down her leg to her foot and was exacerbated while sitting, and Dr. Marino observed that plaintiff did "appear uncomfortable sitting here in the office." (Tr. 335, 503, 567). Plaintiff presented with a slight limp, but was not using assistive devices. (Id.). Dr. Marino opined that the pain in plaintiff's "hip, buttock, and

---

ultrasound was recommended in three to six months. (Id.).

[35]"Frequently" is defined as one-third to two-thirds of an eight-hour workday, while "occasionally" is up to one-third of an eight-hour workday or less. (Tr. 249).

groin area with passive internal and external rotation of the hip" "strongly" suggested right lumbar radiculopathy, but he noted difficulty distinguishing whether the pain was coming from her hip or lower back. (Id.). He referred plaintiff to Dr. John M. Aversa of Connecticut Orthopaedic Specialists, P.C., to see if she was a candidate for a hip replacement. (Id.).

Plaintiff was seen by Dr. Aversa for an orthopaedic consultation on March 20, 2007. (See Tr. 333, 501, 554, 565). Dr. Aversa noted that plaintiff was "a very pleasant appearing female who look[ed] healthy." (Id.). Plaintiff advised Dr. Aversa that her hip had been painful for about eight years, and he noted plaintiff's pain with movement, her severe arthritis in her hip "with decreased joint spaces and sclerosis," as well as her minor arthritis in her knee. (Id.). Dr. Aversa recommended that she undergo a hip replacement. (Id.). He referred plaintiff to Dr. Mark Marieb of the Arrhythmia Center of Connecticut, P.C. for pre-surgery monitoring. (Tr. 334, 502, 555, 566; see Tr. 584-87). Plaintiff called Dr. Marieb's office on March 27, 2007 to advise them that she was a high risk patient in need of pre-operative clearance. (Tr. 260, 397, 459).

Shannon Simmons, Vocational Disability Examiner at the Bureau of Rehabilitation Services, requested plaintiff's medical information from Dr. Rossner on March 27, 2007. (Tr. 257). After Dr. Rossner's examination of plaintiff that next day, he opined that "[f]rom a cardiac standpoint, [plaintiff] actually has been doing well[,]" and should do well with her hip surgery. (Tr. 258, 393, 457). Dr. Rossner wrote to Dr. Aversa, plaintiff's hip surgeon, on March 28, 2007, to advise him of her heart condition and present medication. (Tr. 259, 394, 458; see Tr. 258).[36]

---

[36]Dr. Rossner noted that plaintiff had nonischemic cardiomyopathy with a defibrillator and advised Dr. Aversa about plaintiff's current medication regime of 0.125 mg of Lanoxin once a day,

Plaintiff was seen by Dr. Randolph on March 29, 2007 for a pre-operation physical. (Tr. 355-56, 381-82, 512-13). Plaintiff told Dr. Randolph she was using a cane to maintain balance while she walked because one day her leg gave out and she fell. (Tr. 355, 381, 512; see also Tr. 51). Joint x-rays and a CAT or MRI scan of plaintiff's right hip were taken. (See Tr. 121, 149).[37] Upon examination, Dr. Randolph opined that plaintiff was suffering from osteoarthritis. (Tr. 356, 382, 513). Plaintiff told Dr. Randolph that she saw a cardiologist Monday and was cleared for surgery. (Tr. 355, 381, 512).

As part of plaintiff's surgical clearance, plaintiff underwent an echocardiogram on March 30, 2007; the echocardiogram showed plaintiff having "[a]bnormal left ventricular function with a dilated left ventricle and moderate to severe diminution in the overall ejection function[,]" as well as "[c]oncentric left ventricular hypertrophy." (Tr. 395, 461).

Dr. Marieb monitored plaintiff's cardiac status leading up to her hip surgery and examined her on April 3, 2007. (See Tr. 584-87; see also Tr. 258). He commented that "[m]ore recently she has, from the clinical standpoint, done well. She occasionally has a mild palpitation and mild exertional dyspnea." (Tr. 585). He found plaintiff to have "sinus difficulties, dyspnea on exertion, nocturia X2, occasional palpitations, and . . . hip pain." (Id.). During the examination, plaintiff denied fatigue, weight loss, weight gain, muscle weakness, muscle cramps, fainting, lightheadedness, and difficulty falling asleep. (Id.). Plaintiff's electrocardiogram of April 4, 2007 showed a normal sinus rhythm and a left bundle branch block. (Tr. 588; see also Tr. 586). Plaintiff did not indicate any change

_____

20 mg of Lasix once a day, one and a half 6.25 mg tablets of Coreg twice a day, and 10 mg of Lisinopril once a day. (Tr. 259, 394, 458).

[37]On March 31, 2007, plaintiff alleged that she has had the arthritis in her right hip for the last nine years and that the joint x-rays showed her right hip "eaten away almost half." (Tr. 149).

in the prescriptions that she had been regularly taking, but she was participating in a study of the effects of magnesium, so she was taking three tablets of either magnesium or a placebo daily. (See Tr. 585). Dr. Marieb directed plaintiff to continue taking her Coreg due to her history of arrhythmias. (Tr. 586).

After reviewing plaintiff's blood chest x-ray taken on April 17, 2007, Dr. Sherwin M. Borsuk of Radiology Associates, Inc. concluded that plaintiff had a pacemaker, there was "[n]o active cardiopulmonary pathology," and besides the pacemaker, there was no significant change from plaintiff's chest x-ray of January 18, 2005. (Tr. 361, 374, 460).

On May 3, 2007, Dr. Aversa performed right total hip arthroplasty at the Hospital of St. Raphael with no complications. (Tr. 297-301). During the procedure, Dr. Aversa noted that there were degenerative changes and plaintiff's femoral head was misshapen with articular surface defects. (Tr. 299). In the surgical pathology report, Dr. Aversa noted that "the articular surface display[ed] a 3.0 X 1.5 cm area of eburnation and a 2.5 X 2.5 cm [were] of osteophytes with moderate amount of peripheral osteophytes." (Tr. 301). Plaintiff's medications upon discharge were 9.37 mg Coreg, Coumadin "to be dosed daily," 0.25 mg Digoxin, 100 Colace, 325 mg iron sulfate, 20 mg Lasix, 10 mg Prinivil,[38] 81 mg Aspirin, one Percocet every six hours, and Sarna Lotion topically. (Tr. 297-98).[39] At the time of her release to the Masonic Home on May 6, 2007, plaintiff could put weight

---

[38] Prinivil is the brand name of the generic drug Lisinopril, which inhibits the angiotensin converting enzyme in order to treat high blood pressure and congestive heart failure. (Prinivil Information from Drugs.com, http://www.drugs.com/prinivil.html (last visited July 13, 2010).

[39] Sarna lotion is a topical anesthetic that is used to treat pain, itching, and discomfort on the skin's surface. (Sarna Sensitive Lotion Facts and Comparisons at Drugs.com, http://www.drugs.com/cdi/sarna-sensitive-lotion.html (last visited July 13, 2010)).

on the right lower extremity; she was prescribed daily physical therapy. (Id.).[40]

Dr. Aversa performed plaintiff's post-operation examination on May 15, 2007 and on the right lower extremity; she was prescribed daily physical therapy. (Id.).[41]

Dr. Aversa performed plaintiff's post-operation examination on May 15, 2007 and noted that plaintiff's wound was doing well. (Tr. 329, 440, 497, 551, 561). He directed plaintiff to recommence 5 mg of Coumadin. (Id.). Dr. Aversa told plaintiff to continue sleeping with a pillow between her legs and bear weight on the right side of her body. (Id.).

On May 25, 2007, plaintiff began physical therapy at S.T.A.R. Sports Therapy & Rehabilitation to improve her mobility and strength in her right hip. (Tr. 306-07).[42] At this initial physical therapy session, it was noted that while her soft tissue was well-healed, she has only a five to a six out of ten for movement. (Tr. 306). The physical therapist recommended plaintiff attend physical therapy three times a week. (Id.). On May 30, 2007, the physical therapist noted that plaintiff could not lift her right leg. (Tr. 308).[43] On June 4, 2007, plaintiff showed improvement in strength, but at the expense of a reduction in endurance. (Tr. 310). Plaintiff showed improvement in the strength of her right hip and leg on June 6, 2007, and she said that it felt good, although the physical

---

[40]On May 15, 2007, Dr. Aversa wrote to Masonic Healthcare, to inform them of how pleased plaintiff was with her stay at the facility, which Dr. Aversa noted as "really unusual." (Tr. 330, 439, 498, 552, 562).

[41]On May 15, 2007, Dr. Aversa wrote to Masonic Healthcare, to inform them of how pleased plaintiff was with her stay at the facility, which Dr. Aversa noted as "really unusual." (Tr. 330, 439, 498, 552, 562).

[42]Plaintiff attended physical therapy sessions on May 25 and May 30, 2007, June 1, 4, 6, 8, 11, 13, 15, and 18, 2007. (Tr. 306-16). Plaintiff submitted these records to the Bureau of Rehabilitation Services on August 8, 2007. (Tr. 305).

[43]A similar observation was noted on June 1, 2007 by the physical therapist. (Tr. 309).

therapist noted that plaintiff fatigued "quickly." (Tr. 311). The physical therapist described improvement in the strength and mobility in plaintiff's right hip on June 8, 2007, as well as the plaintiff exhibiting less of a gait pattern, which indicated further improvement. (Tr. 312). On June 11, 2007, the physical therapist observed decreased strength in plaintiff's right hip and noted that plaintiff complained her right hip was sore over the weekend. (Tr. 313). Plaintiff had a one-hundred ten degree range of motion in her right hip and started ambulatory and strength exercises to improve her strength and control of her right leg and hip on June 13, 2007. (Tr. 314). Plaintiff complained of soreness in her right leg from the mid-thigh up to her hip at her physical therapy session on June 15, 2007. (Tr. 315). At plaintiff's final physical therapy session on June 18, 2007, she had difficulty due to "glute weakness" and "quadricep weakness." (Tr. 316).

Plaintiff complained of pain in her right hip when she visited Dr. Randolph on May 31, 2007 for a follow-up visit related to her right hip replacement surgery. (Tr. 375-76, 510-11). At the time of her visit, plaintiff was walking with the assistance of a walker and taking 5 - 325 mg Oxycodone as needed for the pain. (Tr. 375, 510).[44] Dr. Randolph opined that plaintiff was doing well in her recovery and directed plaintiff to continue taking her prescriptions and to attend physical therapy. (Tr. 376, 511).

Simmons requested medical advice regarding reconsideration of plaintiff's application for DIB on June 7, 2007. (Tr. 302). Dr. Joseph Connolly, Jr. submitted a case analysis in response to this request on June 13, 2007. (Tr. 303-04). The reconsideration was based on plaintiff's hip replacement. (Tr. 303). Dr. Connolly reviewed the new

---

[44]Oxycodone is a narcotic pain reliever that is prescribed for moderate to severe pain. (Oxycodone Information from Drugs.com, http://www.drugs.com/oxycodone.html (last visited July 13, 2010)).

evidence, as well as the prior conclusions of Dr. Kaplan, and affirmed the original decision to deny plaintiff social security disability. (See Tr. 304).

Dr. Rossner wrote a report regarding plaintiff's medical history on June 20, 2007, in which he claimed that despite the implantation of the defibrillator, plaintiff had "severe left ventricular dysfunction," such that she was "unable to do any real physical work." (Tr. 392, 454). Dr. Rossner also noted plaintiff's complaints of shortness of breath upon any physical exertion. (Id.). He opined that he "expect[ed] her cardiac disability certainly to go beyond a year and she will be monitored with serial echocardiograms to reevaluate her function." (Id.).

When plaintiff was examined by Dr. Aversa on June 26, 2007, she complained of mild discomfort in her right leg and hip even though Dr. Aversa noted that she moved well. (Tr. 328, 441, 496, 550, 560). He advised plaintiff to avoid putting her full weight on her right hip and to avoid abduction. (Id.). Dr. Aversa subsequently examined plaintiff on July 24, 2007 and observed that plaintiff had weak abductors, mild Trendelenburg gait, and used a cane. (Tr. 327, 442, 495, 549, 559). He advised that plaintiff continue physical therapy twice a week for a month, and then work on her rehabilitation with a home program. (Id.).

In a letter regarding plaintiff's right hip replacement surgery, dated July 26, 2007, Dr. Marino opined that plaintiff "has been physically disabled from work for at least the last six months." (Tr. 326, 443, 494, 558). While Dr. Marino expected plaintiff to improve from her hip surgery, he was "almost certain that she will have some significant limitations for the duration of her life based upon the multiple orthopedic and cardiac issues," so that plaintiff would not be "capable of performing full time or competitive

work." (Id.).[45]


Plaintiff was seen by Dr. Rossner on April 4, 2008 for the completion of a Cardiac Impairment Questionnaire. (Tr. 411-16; see also Tr. 174, 451). He diagnosed plaintiff with New York Heart Association Class III heart failure. (Tr. 411; see also Tr. 174, 451). At the time of the questionnaire, plaintiff was taking 0.125 mg Digoxin, 20 mg Lasix, 1-1/2 tablets of 6.25 mg Coreg, and 10 mg Lisinopril daily. (Tr. 413). Dr. Rossner stated that plaintiff's primary symptoms were dyspnea - or shortness of breath - and fatigue, which were "consistent with the patient's physical . . . impairments," and brought on by physical exertion. (Tr. 411-13). In Dr. Rossner's opinion these symptoms were prone to give plaintiff bad and good days, and would increase if plaintiff was placed in a competitive work environment. (Tr. 413-14). Dr. Rossner also opined that plaintiff's symptoms were present since April 2006 and affect her attention and concentration. (Tr. 415; see also Tr. 174, 451). Furthermore, Dr. Rossner thought that plaintiff could "sit for six hours, stand/walk for less than one hour, and occasionally lift or carry up to five pounds in an eight-hour workday," but plaintiff's condition would still cause her to miss

---

[45]As discussed above, on August 2, 2007, plaintiff began receiving Social Security Retirement benefits, the date of her 65th birthday.

Plaintiff was seen by Dr. Aversa on November 27, 2007 for a follow-up visit on her right hip replacement; she complained of "occasional lateral thigh discomfort," which Dr. Aversa opined was consistent "with a trochanteric bursal area." (Tr. 325, 437, 493, 544, 548, 557). Dr. Aversa referred plaintiff to physical therapy for "iontophoresis and abduction strengthening." (Id.). One week later, Dr. Rossner examined plaintiff on December 6, 2007 and noted plaintiff "continue[d] to do very well." (Tr. 391, 455). Plaintiff told Dr. Rossner that she had been feeling good with no shortness of breath, palpitations, chest pain, or peripheral edema. (Id.). Dr. Randolph also performed a check-up on December 6, 2007. (Tr. 350-51, 508-09). Plaintiff's chief complaints during this visit related to her thyroid and symptoms related to menopause. (Tr. 351, 509). Dr. Randolph noted that plaintiff had a normal gait and no change in plaintiff's prescriptions since May 31, 2007. (Tr. 350-51, 508-09). As of 2008, plaintiff's prescription for Coreg was replaced with 1-1/2 6.25 mg tablets of Carvedilol daily by Dr. Rossner. (Tr. 177; see Tr. 446).

work at least three times a month. (Tr. 413-14; see also Tr. 174, 451).[46]

Dr. Rossner examined plaintiff on February 12, 2009 for a follow-up for her cardiomyopathy, not having been to the doctor's office "in well over a year." (Tr. 523, 572, 579; see Tr. 524, 573, 580).[47]   She denied having any chest pain, palpitations or shortness of breath, Dr. Rossner did not make any changes in her prescriptions, and he observed that she "continue[d] to do well." (Tr. 523, 572, 579).

## III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.   First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.   See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).   Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."   Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).   The substantial

---

[46] Plaintiff visited Dr. Rossner on April 8, 2008 to check her heart and related prescriptions. (Tr. 445). On November 12, 2008, Dr. Aversa wrote a letter on plaintiff's behalf explaining that she would be "an unreliable juror" because she could not sit for long periods of time due of her right hip replacement surgery.  (Tr. 492, 543, 547, 556).

Additionally, Dr. Peter Leff of the Surgical Associates of Meriden, P.C. saw plaintiff on July 10, 2008 for a breast examination related to her previous right breast cancer. (Tr. 530).  He noted that plaintiff had a "stabile benign area of her right breast" by the biopsy site. (Id.).  He noted that he could not find any masses and that she was cancer free. (Tr. 445, 530). Plaintiff had her annual bilateral mammogram on January  22, 2009 as a follow-up to her 1998 breast biopsy. (Tr. 527-28). Dr. James W. Carroll of MidState Medical Center Radiology Services concluded that plaintiff's mammogram was "[s]table . . .with probably benign right biopsy scar site." (Tr. 527).

[47] At Dr. Rossner's request, plaintiff had an electrocardiogram on that same day. (Tr. 573, 580).

28

evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's

impairment with those in Appendix 1 of the Regulations [the "Listings"].  <u>See</u> 20 C.F.R. § 404.1520(d); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 141 (1987); <u>Balsamo</u>, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  <u>See</u> 20 C.F.R. § 404.1520(d); <u>see also</u> <u>Balsamo</u>, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  <u>See</u> 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  <u>See Balsamo</u>, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  <u>See</u> 20 C.F.R. § 404.1520(f); <u>see also</u> <u>Balsamo</u>, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  <u>See</u> 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  <u>See</u> 20 C.F.R. §

200.00(e)(2). If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV. DISCUSSION

Following the five step evaluation process, ALJ Burlison found that plaintiff had not engaged in any substantial gainful activity since April 1, 2006, the alleged onset of her disability. (Tr. 17; see 20 C.F.R. § 404.1520(b) et seq.). ALJ Burlison then concluded that the medical evidence supported a finding that plaintiff had the following severe impairments: history of cardiomyopathy with defibrillator implant, and history of arthritis status post hip replacement. (Tr. 17; see 20 C.F.R. § 404.1520(c)). In the third step of the evaluation process, the ALJ concluded that plaintiff's severe impairments did not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 17). In addition, at step four, ALJ Burlison found that plaintiff had the residual functional capacity to perform the light work as defined in 20 C.F.R. § 404.1567(b) with occasional postural limitations. (Tr. 17-18). The ALJ concluded that plaintiff was capable of performing past relevant work as a sales auditor as this work did not require the performance of work-related activities precluded by the claimant's residual functional capacity. (Tr. 18). Accordingly, the ALJ concluded that plaintiff has not been under a disability, as defined in the Social Security Act, from April 1, 2006 through the date of this

decision.[48] (Tr. 18-19).

Plaintiff moves for judgment on the pleadings on grounds that the ALJ failed to follow the treating physician rule in failing to give Drs. Rossner and Marino's opinions controlling weight and in failing to give "good reasons" for rejecting these opinions (Dkt. #8, Brief at 12-17), and the ALJ failed to properly evaluate plaintiff's credibility. (Id. at 17-20). In defendant's Motion for Order Affirming the Decision of the Commissioner, defendant asserts that the ALJ properly declined to afford controlling weight to the opinions of plaintiff's treating physicians as they are inconsistent with the evidence of record (Dkt. #11, Brief at 13-20), and the ALJ properly considered the credibility of plaintiff's complaints of pain. (Id. at 20-26).

A. TREATING PHYSICIAN OPINION

According to plaintiff, the ALJ erred in rejecting the opinion of Dr. Rossner; the ALJ failed to cite any evidence that contradicted his findings; and the ALJ failed to further develop the record to clarify any inconsistencies. (Dkt. #8, Brief at 13-15). Additionally, plaintiff contends that the ALJ also erred in rejecting Dr. Marino's opinion and failed to give "good reasons" for rejecting his opinion. (Id. at 15-17). Defendant contends that Dr. Rossner's opinion is inconsistent with other evidence, including his own treatment notes, and the ALJ did not have a duty to contact the treating source as the record contains sufficient evidence for the ALJ to render her decision. (Dkt. #11, Brief at 14-16). Moreover, according to defendant, the ALJ did not err in the weight she assigned to Dr.

_____

[48]As discussed above, plaintiff's date last insured to qualify for disability benefits under 42 U.S.C. 423(c) was March 31, 2008. (See Dkt. #8, Brief, at 1, n.1). Plaintiff began receiving Social Security Retirement benefits on her 65th birthday (see Tr. 36), which was August 2, 2007. Therefore, the relevant period of disability at issue for the purpose of plaintiff's claim is the period from April 1, 2006 to August 1, 2007. (Dkt. #8, Brief, at 1, n.1).

Marino's opinion. (Id. at 16-20).

In her decision, the ALJ noted that in January 2007, Dr. Rossner reported that the claimant had been "doing quite well," with no shortness of breath or palpitations, and that, according to Dr. Rossner, plaintiff's blood pressure was under control and overall, she was doing well. (Tr. 16). The ALJ then observed that plaintiff was cleared for hip surgery and Dr. Rossner reported that plaintiff "actually has been doing well," although in a letter, dated June 20, 2007, Dr. Rossner opined that plaintiff was "unable to do any 'real physical work' but did not state that the claimant was totally disabled from all work activity." (Id.). ALJ Burlison then held:

> There is actually no indication of any treatment with Dr. Rossner from March 2007 until December 2007 when the claimant reported for a regular check up and reported that "she has been feeling good" with no shortness of breath, palpitations, chest pain or edema. It is interesting to note that by form dated April 4, 2008, Dr. Rossner gave the claimant a very limited residual functional capacity and states that the claimant's symptoms include shortness of breath, palpitations, fatigue and weakness.

(Id.). Accordingly, the ALJ concluded that "Dr. Rossner's opinion of April 4, 2008 [was] not given controlling weight as it [was] not supported by his own treatment notes which clearly indicate[d] that the claimant [was] doing quite well." (Id.)(citations omitted).

Dr. Rossner's treatment notes reflect that as of April 25, 2006, after plaintiff was discharged from his hospitalization at Middlesex, plaintiff reported that she "fe[lt] fine," although she stated that "whenever she [got] into a situation where it [was] crowded and warm, she [became] lightheaded." (Tr. 264, 402). A month later, when plaintiff returned to Dr. Rossner for the results of her stress test and twenty-four hour Holter monitor, plaintiff reported that she had been "feeling fine." (Tr. 263, 401). While plaintiff testified that around this time Dr. Rossner told her not to work, this is not confirmed in Dr.

Rossner's treatment records. (Tr. 47). In June 2006, plaintiff had a dual chamber cardioverter-defibrillator implanted, after which plaintiff experienced intermittent chest pain and shortness of breath. (Tr. 237). When Chunis of SSA completed her Request for Medical Advice on October 5, 2006, she noted that "claimant has past [history] of sedentary work. Doubtful less than sedentary can be done." (Tr. 246)(emphasis omitted). In response to Chunis' request, Dr. Barbara Coughlin noted that plaintiff had "dyspnea, dizziness & palpitations[,]" which would require a consultative examination for a better evaluation of plaintiff's heart condition and arthritis, although Dr. Coughlin concluded that she would give plaintiff a "light RFC," but if plaintiff continued to claim a disability, plaintiff's arthritis would have to be evaluated. (Tr. 247-48). In October 2006, Dr. Rossner noted that plaintiff "had no shortness of breath or chest pain," but was "tired all the time." (Tr. 262, 400). Three months later, Dr. Rossner observed that plaintiff was doing well after her defibrillator surgery and not suffering from shortness of breath, blood pressure issues, or heart palpitations. (Tr. 261, 373, 398). One month earlier, in December 2006, Dr. Kaplan, who examined plaintiff on behalf of SSA, noted that plaintiff complained of fatigue. (Tr. 256).

On March 28, 2007, Dr. Rossner opined that "[f]rom a cardiac standpoint, [plaintiff] actually has been doing quite well," and "should do well with her [hip] surgery." (Tr. 258, 393, 457).[49] Six days later, on April 3, 2007, Dr. Marieb, another one of plaintiff's cardiologists, noted that plaintiff had dyspnea on exertion, and occasional palpitations, but plaintiff denied fatigue, fainting and lightheadedness. (Tr. 585). Following her hip surgery, plaintiff was seen by Dr. Randolph on May 31, 2007 at which

---

[49]Defendant accurately points out that there are no treatment records from Dr. Rossner for the following eight months, from March 2007 to December 2007.

time she was walking with the assistance of a walker; Dr. Randolph opined that plaintiff was doing well. (Tr. 375-76, 510-11). When plaintiff was receiving physical therapy for her hip in June 2007, her therapist noted that plaintiff fatigued quickly. (Tr. 311).

On June 20, 2007, Dr. Rossner authored a letter to plaintiff's counsel, in which he stated that although plaintiff has a defibrillator implanted, she "remain[ed] with severe left ventricular dysfunction[,]" and was "unable to do any real physical work." (Tr. 392, 454). According to Dr. Rossner, even though none of his previous medical records included this limitation, he noted that plaintiff complained of "shortness of breath" upon "any type of physical exertion." (Id.). To the contrary, Dr. Rossner's records that pre-dated this letter repeatedly referenced that plaintiff did not have shortness of breath. (See Tr. 261, 262, 373, 398, 400). Additionally, when Dr. Rossner saw plaintiff in December 2007, after an eight-month hiatus, he noted that she "continue[d] to do very well," and she had no shortness of breath, palpitations, chest pain, or peripheral edema. (Tr. 391, 455). However, contrary to this report, on April 4, 2008, in his Cardiac Impairment Questionnaire, Dr. Rossner again opined that plaintiff had the clinical symptoms of shortness of breath, fatigue, weakness and palpitations, which findings were supported by her cardiac catherization, a 2-D echocardiogram and her diagnosis of New York Heart Association Class III heart failure;[50] Dr. Rossner also noted that her primary symptoms were dyspnea and fatigue. (Tr. 411-12). Dr. Rossner also concluded that these symptoms were prone to give plaintiff bad and good days, and would increase if

---

[50]The New York Heart Association Class III heart failure is defined as including "[p]atients with cardiac disease resulting in marked limitation of physical activity. They are comfortable at rest. Less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." See Classification of Functional Capacity and Objective Assessment http://www.americanheart.org/presenter.jhtml?identifier=4569 (last visited August 11, 2010).

plaintiff were placed in a competitive work environment. (Tr. 413-14). Dr. Rossner opined that plaintiff's symptoms were present since April 2006 and affected her attention and concentration. (Tr. 414-15). Furthermore, Dr. Rossner thought that plaintiff could sit for six hours, stand/walk for less than one hour, and occasionally lift or carry up to five pounds in an eight-hour workday, but plaintiff's condition would still cause her to miss work at least three times a month. (Tr. 413-14).

As the Second Circuit has made clear, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted); see 20 C.F.R. § 404.1527 (d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight."). As one of plaintiff's treating sources, Dr. Rossner's opinion was entitled to more weight as "[g]enerally, . . . more weight [is given] to opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(d)(2); see also 20 C.F.R. § 404.1527(d)(1)("[g]enerally, . . . more weight [is given] to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]."). However, ALJ Burlison is correct that Dr. Rossner's conclusions were not supported by his own contemporaneous

medical records, nor was there "other substantial evidence" to the contrary. The only two references to a cardiac impairment are the passing notes of Dr. Coughlin in October 2006, that plaintiff had "dyspnea, dizziness & palpitations[,]" as well as the comprehensive notes of Dr. Marieb in April 2007 that plaintiff had dyspnea on exertion and occasional palpitations, but again, these notes also reflected that plaintiff denied fatigue, fainting and lightheadedness. (Tr. 248, 585). Thus, "[w]hen, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that [the ALJ] . . . have explained why [he or she] considered particular evidence unpersuasive or insufficient to lead [him or her] to a conclusion of disability." Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)(citation omitted).

Plaintiff also contends that the ALJ's "ambiguous finding" regarding Dr. Marino's opinion "fails to provide sufficient specificity to allow meaningful judicial review of this portion of her determination of what weight was given to the treating specialist." (Dkt. #8, Brief at 15). In her decision, ALJ Burlison noted that plaintiff underwent hip surgery in May 2007 and by letter dated July 26, 2007, Dr. Marino "reported that the claimant was doing quite well post surgery but had been disabled for at least the then past six months but noted that he did not know how long she would be disabled"; Dr. Marino suggested that plaintiff contact Dr. Aversa. (Tr. 16). The ALJ then noted that Dr. Aversa "indicated that by November 2007 the claimant was suffering from only occasional thigh discomfort but was capable of standing on one leg. The claimant was sent for a course of physiotherapy and told to take over the counter medications for pain." (Id.). According to plaintiff, "[a]pparently [the ALJ] discounted Dr. Marino's opinion on this basis." (Dkt. #8, Brief at 15).

Dr. Marino began treating plaintiff in November 2006 for right lumbar radiculopathy, osteoarthritis in her right hip, and tendinitis in her right rotator cuff. (Tr. 336-37, 505-06, 569-70). In his July 26, 2007 letter to plaintiff's counsel, Dr. Marino opined that plaintiff:

> certainly has been physically disabled from competitive work for at least six months. While I do expect her to improve, I cannot state accurately to what extent her recovery from the [hip] surgery will be. The patient does have other issues, including a significant cardiac history. It is almost certain that she will have some significant limitations for the duration of her life based upon the multiple orthopedic and cardiac issues. I will defer to Dr. Aversa any specific comments as to the expected recover from the hip replacement surgery.

(Tr. 326, 443, 494, 558).[51]

In this letter, Dr. Marino also noted that plaintiff's right shoulder pain was resolved with a corticosteroid injection, and the pain associated with her right lumbar radiculopathy and inguinal/groin pain that was consistent with osteoarthritis were "likely emanating from the osteoarthritic right hip," for which Dr. Marino referred plaintiff to Dr. Aversa. (Id.). Thus, the conclusions in his July letter were relating to plaintiff's hip impairment for which Dr. Marino relied on Dr. Aversa's opinion as to plaintiff's prognosis, and to the extent Dr. Marino referenced "some specific limitations for the duration of [plaintiff's] life based upon the multiple orthopedic and cardiac issues[,]" he did not elaborate on the extent of these limitations.

----

[51]Dr. Aversa, who treated plaintiff's hip, noted in June and July 2007 that plaintiff complained of mild discomfort in her right leg and hip even though she moved well, and she had weak abductors, mild Trendelenburg gait, and used a cane. (Tr. 327-28, 441-42, 495-96, 549-50, 559-60). He recommended a physical therapy program for twice a week for a month. (Id.). As of November 2007, plaintiff had occasional lateral thigh discomfort, and he referred for her "physiotherapy for some iontophoresis and abduction strengthening" and recommended that she take over the counter pain relievers. (Tr. 325, 437, 493, 544, 548, 557). The ALJ's characterization of Dr. Aversa's opinions is correct. (Tr. 16).

While Dr. Marino is a treating physician who specializes in orthopedics, whose opinion was based upon medically acceptable clinical and diagnostic findings, his opinion that plaintiff was disabled for the previous six months is not a medical opinion that falls within such meaning under the regulations. While he opined that plaintiff has been physically disabled from competitive work for at least the last six months, he expected her to improve after her hip surgery, which improvement would be more accurately assessed by Dr. Aversa. (Id.). See Mongeur v. Heckler, 722 F.2d at 1040. Accordingly, the ALJ did not err in failing to give controlling weight to Dr. Marino's opinion that plaintiff was disabled in the previous six months.

B. CREDIBILITY

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . ." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). A strong indication of the credibility of a claimant's statements is their consistency, both internally and with other information in the case record. See SSR 96-7p, 61 Fed. Reg 34483, 34486 (S.S.A. July 2, 1996); see Marcus, 615 F.2d at 27. An ALJ must compare a claimant's statements made in connection with her claim with statements she made under other circumstances that are in the case record, and statements a claimant made to treating and examining medical sources are especially important. "After weighing any existing inconsistencies between the plaintiff's testimony of pain and limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment." Romano v. Apfel, No. 99 CIV 2689 LMM, 2001 WL 199412, at *6 (S.D..N.Y. Feb. 28, 2001)(citations omitted). If the ALJ does discredit a plaintiff's testimony, she must do so

with sufficient specificity.  Id.

When evaluating plaintiff's credibility, ALJ Burlison found that although plaintiff alleged that she was fatigued all the time with shortness of breath, had arthritic pain, and was unable to move freely because of her arthritic pain, the record does not support her allegations; plaintiff denied "any alcohol involvement" despite a record of alcohol abuse; and plaintiff testified that her past relevant work required her to perform duties that were in excess of the sedentary range of exertional requirement when all prior evidence clearly reports otherwise. (Tr. 18).  The primary inconsistencies upon which the ALJ relied to reach her conclusion regarding plaintiff's credibility were plaintiff's claims about her ability or inability to lift objects, and her inconsistencies regarding her history of alcohol abuse. (Id.). ALJ Burlison found that the fact that plaintiff testified that she would have to lift "fairly heavy boxes on a daily basis[,]" even though she also reported that she "sat for eight hours a day and handled small objects for eight hours" but was not required to lift anything over ten pounds, and the fact that plaintiff testified that she never had a drinking problem but the record reflects that her cardiac problems were most likely related to longitudinal alcohol abuse and alcohol withdrawal, "do not reflect favorably on the claimant's overall credibility despite her strong work history."  (Tr. 15).

As discussed above, as of July 2006, plaintiff stated she was able to clean the house daily, do the laundry, and iron without assistance; however, she noted that since the onset of her physical condition these tasks took her longer because she fatigued easily. (Tr. 127; see Tr.  155, 169, 317).  A year later, she confirmed her ability to do her daily chores, although she noted that she had to stop to rest while cleaning, and she reported that she could no longer do yard work because her yard is too large. (Tr. 145).

By August 14, 2008, when plaintiff testified before the ALJ, she stated that she was able to dust and do minor household cleaning, but her daughter had to help her with heavy cleaning. (Tr. 46). Similarly, in July 2006, plaintiff reported that she was able to make sure her dog has food and water and she would walk her dog in the yard (Tr. 124-25), but as of March 31, 2007, plaintiff alleged that her daughter must walk her dog and buy the dog food. (Tr. 142). Additionally, while plaintiff reported that she could walk or drive in 2006, by 2008, plaintiff testified that although she still had a driver's license, she could not drive anymore because of the arthritis in her right leg. (Tr. 44, 127; see Tr. 143, 145). Plaintiff noted in July 2006 that she "sometime[s]" had problems with her left leg and knee due to arthritis, which affected her ability to climb stairs and kneel. (Tr. 130)(emphasis omitted). Plaintiff claimed she was prescribed a cane for this problem and had to stop to rest for fifteen to twenty minutes after walking a half mile. (Id.).[52] However, a year later, plaintiff reported that her ability to sit, stand, climb stairs, kneel, and lift was affected by bad arthritis in her right hip, such that she needed a cane to walk. (Tr. 148). In her testimony of August 14, 2008, plaintiff claimed that she could not stand for more than five minutes, sit for over a half-hour, nor carry more than five pounds because of the pain in her right hip. (Tr. 48-49, 54). Consequently, plaintiff described how she must sit down and elevate her leg for an hour due to the pain after standing tasks. (Tr. 52). Additionally, in her testimony before the ALJ on August 14, 2008, plaintiff alleged that she could only walk for a half a block before having to stop and rest for five to ten minutes because she was out of breath and had chest pains. (Tr. 53; see

---

[52]Defendant asserts that plaintiff reported in March 2008 that she walked at least one mile a day; however, defendant erroneously relies on medical records of the wrong person that were included in the administrative transcript. (See Dkt. #11, Brief, at 25; Tr. 535; see note 20 supra).

Tr. 148).

As discussed above, there are entries substantiating plaintiff's complaints of shortness of breath, fatigue, and arthritic pain, and while plaintiff's pain was reduced to mild discomfort after her hip surgery, plaintiff continued to complain to her doctors of "pain[,]" "occasional . . . discomfort[,]" or "some mild discomfort" in the year following her hip surgery. (See Tr. 325, 328, 375-76, 437, 441, 493, 496, 510-11, 544, 548, 550, 557, 560). Additionally, in April 2006, plaintiff claimed that while she has not had an alcohol abuse problem "for the last [twenty] years," she admitted that she had a drinking problem when she owned a bar. (Tr. 198, 345, 421-22). However, on May 31, 2007, plaintiff denied the allegations of alcohol abuse and a year later, testified before the ALJ that she occasionally consumed alcohol, but never had an alcohol problem. (Tr. 49, 159). The foregoing notwithstanding, the objective medical evidence reveals that in 2001, plaintiff was diagnosed by Dr. Rossner with nonischemic cardiomyopathy, which was attributed to ethanol abuse (Tr. 392), and in July 2001, when plaintiff underwent a cardiac catherization at St. Francis Hospital, her "history of heavy alcohol abuse" was noted. (Tr. 584; see also Tr. 194, 432). When plaintiff was hospitalized in 2006 at St. Francis Hospital, her medical records revealed a suspicion that plaintiff's cardiomyopathy was secondary to alcohol abuse, even though plaintiff initially denied regular heavy alcohol abuse. (Tr. 180-81, 194, 196-200, 419-21, 432). When she was in the emergency room, plaintiff admitted to drinking a couple of glasses of wine a week, which she later revised to acknowledging that she drank "three or so" glasses of wine two days prior to her hospitalization. (Tr. 193, 198-99). During this hospitalization, doctors noted that plaintiff went through mild alcohol withdrawal, as evidenced by withdrawal tremors.

(Tr. 180-81, 194, 200, 419-20, 423, 432).

The Social Security Act provides that all of the evidence presented will be considered "including information about [plaintiff's] work record." 20 C.F.R. § 416.929(c)(3); see also SSR 96-7p, 61 Fed. Reg at 34486. While plaintiff is correct that because she had a good work history, she is "entitled to substantial credibility when claiming inability to work" (Dkt. #8, Brief at 19-20, citing Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir. 1983)(additional citations omitted)), the ALJ is entitled to reach her conclusion after consideration of all of the entire case record.

## V. CONCLUSION

For the reasons set forth above, plaintiff's Motion for Judgment on the Pleadings (Dkt. #8) is **denied**, and defendant's Motion for Order Affirming the Decision of the Commissioner (Dkt. #11) is **granted**.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. §636(b)**(written objection to ruling must be filed within fourteen days after service of same)**; FED. R. CIV. P. 6(a), 6(e), & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated this 18th day of February, 2011 at New Haven, Connecticut.

_/s/ Joan G. Margolis, USMJ___
Joan Glazer Margolis
United States Magistrate Judge